# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL J. O'DONNELL, | ) | CASE NO. 1:08CV1056 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION** |
| SECURITY, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

Before the Court is the Report and Recommended Decision ("R&R") of Magistrate Judge David S. Perelman (Doc. No. 21) with respect to plaintiff's request for judicial review of defendant's denial of his claim for disability benefits ("DIB") and supplemental security income benefits ("SSI"). Plaintiff filed objections and defendant filed a response to those objections. (Doc. Nos. 24 and 25, respectively.)

Upon *de novo* review and for the reasons set forth below, the Court hereby **REJECTS** the R&R, **REVERSES** the denial of benefits, and **REMANDS** for further consideration consistent with this opinion and for a new determination regarding benefits.

# I.

## PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff applied for benefits on April 4, 2003, alleging a disability onset date of December 12, 2002. (Transcript ["Tr."] 81.) His application was denied initially and upon reconsideration. (Tr. 40, 41.) On plaintiff's request, a hearing was conducted before an Administrative Law Judge ("ALJ") on December 23, 2005, with plaintiff represented by counsel. (Tr. 322-84.) A vocational expert ("VE") testified at the hearing.[1] Plaintiff was permitted to submit a post-hearing brief. (Tr. 24-28.) On February 23, 2006, the ALJ issued a decision affirming the denial of benefits. (Tr. 13-23.) Plaintiff timely appealed and, on February 28, 2008, the Appeals Council declined to review his case, making the ALJ's decision final. (Tr. 5-8.)

Plaintiff timely filed the instant action under 42 U.S.C. § 405(g) and 1383(c)(3) seeking judicial review of the administrative determinations. Plaintiff, represented by counsel, filed his brief on the merits (Doc. No. 18); defendant filed a response brief (Doc. No. 19); and plaintiff filed a reply (Doc. No. 20).

On April 17, 2009, Magistrate Judge Perelman issued his R&R. (Doc. No. 21.)

# II.

## STANDARD OF REVIEW

This Court's review of the Magistrate Judge's R&R is governed by 28 U.S.C. § 636(b), which requires a *de novo* decision as to those portions of the R&R to which objection is made. Judicial review is limited to a determination of whether the ALJ applied the correct legal

---

[1] The VE's testimony begins at page 351 of the record.

standards and whether there is "substantial evidence" in the record as a whole to support the decision.  42 U.S.C. § 405(g); *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance. *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). It is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (quoting *Stanley*). If there is substantial evidence to support the defendant's decision, it must be affirmed even if the reviewing court might have resolved any issues of fact differently and even if the record could also support a decision in plaintiff's favor. *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986).

## III.

## DISCUSSION

The R&R recommends that the final determination to deny DIB and SSI benefits be affirmed and that final judgment be entered in the defendant's favor. Plaintiff has raised objections to the following findings of the Magistrate Judge:

(1)    the ALJ gave proper consideration to the medical opinions of record;

(2)    the ALJ properly found that O'Donnell's impairment did not meet or equal a listing;

(3)    the ALJ did not err in failing to call a medical expert for assistance in evaluating O'Donnell's impairments;

(4)    the ALJ did not err in failing to address the special accommodations under which O'Donnell had previously worked; and

3

(5)     the ALJ's findings at step four and five of the sequential evaluation were
supported by substantial evidence.

Pursuant to 28 U.S.C. § 636(b), the Court will address *de novo* those parts of the findings and objections which are dispositive.

Plaintiff argues that the ALJ failed to give the proper weight to the medical opinions in the record. He first asserts that the opinion of Dr. Judie Shields, Ph.D. was rejected because the ALJ improperly viewed her as a one-time consultative physician rather than a treating physician. Plaintiff argues that Dr. Shields, although initially seeing him for purposes of evaluation for a disability, observed him over a period of three months and, in essence, treated him on three occasions (August 18, 2003, October 1, 2003 and October 10, 2003). This appears to be a misreading of the record. Dr. Shields' records are in the transcript at pages 206 through 214. When these pages are reviewed carefully, it is apparent that she saw the plaintiff on August 18, 2003 and conducted an Adult Diagnostic Assessment which took a total of 50 minutes. (Tr. 208.) It is also obvious that her written report on this visit was made on October 1, 2003. (Tr. 213.) That does not constitute two separate visits as plaintiff has argued in his objections. Dr. Shields also completed a "Mental Functional Capacity Assessment" (Tr. 206-07) which was apparently based on an October 10, 2003 visit.

In light of these facts, there was no reason to give Dr. Shields' findings the weight of a treating physician and the ALJ did not err in failing to do so. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("[a] physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'") (quoting 20 C.F.R. §

4

404.1502). Even if this Court concludes that Dr. Shields saw plaintiff twice, it was strictly for evaluation, not treatment.

The ALJ compared and contrasted the findings of the two consultative physicians, Dr. Shields and Dr. Michael Leach, Ph.D., and read them somewhat in conjunction with each other. Since neither was a treating physician whose conclusions would be entitled to greater weight, and since the two examined the plaintiff within relatively the same time frame,[2] it was within the purview of the ALJ to compare their opinions and to decide how to credit the findings of each.[3]

Dr. Leach's testing of the plaintiff resulted in a verbal IQ of 66, a performance IQ of 73, and a full scale IQ of 66, which would indicate "that he is functioning within the mild mental retardation range of intelligence." (Tr. 232.) Dr. Leach, however, considered these results invalid (Tr. 232) because plaintiff had failed to "cooperat[e] with psychological testing and gave minimal effort." (Tr. 19.) Dr. Leach estimated plaintiff's intellectual functioning to be in the borderline range. (Tr. 232.)

As for Dr. Shields, the ALJ noted that her conclusions of "marked and extreme limitations" were not "based on any psychological testing."[4] Further, in view of Dr. Leach's observation that plaintiff tended not to cooperate with psychological testing and that he had further "discussed being able to complete chores for his sister, play softball when his knee is not

---

[2] Dr. Leach and Dr. Shields evaluated the plaintiff in June 2003 and August/October 2003, respectively. These evaluations were close enough in time to warrant comparing and contrasting.

[3] Even where the treating physician rule applies, the ALJ is free to discredit the physician's conclusions if he gives "good reasons" for not allowing controlling weight. 20 C.F.R. § 416.927(d)(2); SSR 96-20; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). Here the ALJ discussed the physicians' conclusions at some length and gave sufficient record-based reasons for his determinations.

[4] Plaintiff argues that mental functional capacity is not measured by tests but by observation and that Dr. Shields observed plaintiff's "inability to comprehend information or determine essential vs. non-essential facts/information." (Tr. 19.)

hurting, play games and cards with family and friends and watch movies, all of which require concentration and ability to carry out and follow directions[ ]" (Tr. 19), there was substantial evidence in the record to support the ALJ's decision to discredit Dr. Shields's observations and for his conclusion that plaintiff has a higher mental capacity than Dr. Shields's observations would indicate.[5]

Plaintiff also challenges the ALJ's conclusions regarding the findings of Dr. Mark Cohen, Psy.D., an independent doctoral psychologist who conducted a psychological evaluation in May 2005 on referral from the State agency. (Tr. 275-279.) Plaintiff points out, correctly in this Court's view, that the ALJ improperly concluded that the IQ results from Dr. Cohen's tests were unreliable because of "the strong evidence of lack of effort and uncooperativeness at the psychological consultative evaluation, leading to invalid IQ scores at that evaluation." (Tr. 19-20.) There was *no* evidence that plaintiff did not cooperate with Dr. Cohen. The ALJ justifies his conclusion of non-cooperation by pointing to Exhibit 6F (at Tr. 230-34); however, this is the report of Dr. Leach from June 2003. Dr. Cohen's report has not the slightest mention of non-cooperation. Obviously, the fact that plaintiff may not have cooperated with Dr. Leach in 2003 cannot be extended to a conclusion that he was still not cooperative in 2005 when Dr. Cohen conducted the psychological tests. This is a serious flaw in the ALJ's analysis of Dr. Cohen's opinion and one which, unfortunately, was not detected by the Magistrate Judge.

Dr. Cohen administered a larger battery of tests than Dr. Leach and concluded that plaintiff "is functioning in the mildly mentally retarded range in verbal abilities and the

---

[5] Plaintiff asserts that Dr. Leach's conclusions were based on a one-time consultation and that Dr. Shields "treated" plaintiff for three months. The Court has already rejected this characterization of Dr. Shields as a treating physician. It is quite clear that both Dr. Leach and Dr. Shields merely evaluated plaintiff for purposes of a disability determination. It is possible that Dr. Shields saw plaintiff twice; however, that does not qualitatively add to her opinion of the plaintiff's condition.

borderline range in performance abilities." (Tr. 279.)[6] Plaintiff's "memory abilities were much better developed than his intellectual abilities." (Tr. 279.)[7] "All of [plaintiff's] other cognitive abilities were in the borderline to impaired range and consistent with his level of intellectual development." (Tr. 279.)[8]

Dr. Cohen concluded that, vocationally, plaintiff "would be capable of performing simple hands on types of jobs that do not require reading or writing abilities and do not require following complex directions." (Tr. 279.) The ALJ agreed with this conclusion.

Dr. Cohen further concluded that plaintiff's "work speed will likely be slow" and that he might benefit from a "job coach to help orient him to a new job and learn the responsibilities." (Tr. 279.) The ALJ rejected Dr. Cohen's assessment of plaintiff's work speed, concluding that he had successfully worked as a janitor, a semi-skilled SVP 3 job,[9] for over ten years, and that he had never shown any need for a job coach. This conclusion of the ALJ is clearly not supported by substantial evidence in the record. Although plaintiff testified at the hearing conducted by the ALJ, he was not questioned about the nature of the "janitor" jobs he supposedly held from June to September, 2001; June 1998 to June 1999; October 1995 to June 1998; and June 1983 to June 1998. (Tr. 125-26.)

---

[6] Plaintiff's IQ scores on the WAIS-III were 63 verbal, 70 performance and 63 full scale. (Tr. 276.)

[7] Although plaintiff reported memory problems, Dr. Cohen concluded that these were likely "due to anxiety, depression and stress, but not organic impairment." (Tr. 279.) He reached this conclusion based on plaintiff's memory scores, which were inconsistent with his reported memory problems.

[8] The ALJ noted that plaintiff's "basic reading skills were at the first grade level, his reading comprehension skill was at the 2.3 grade level and his broad written language skills were at the 3.4 grade level." (Tr. 19.)

[9] SVP stands for "Specific Vocational Preparation" and is defined as "the amount of time required by a typical worker to learn the techniques, acquire information, and develop the facility needed for average performance in a specific job-worker situation." (Tr. 302.) A level 3 job requires "[o]ver 1 month up to and including 3 months" of specific vocational preparation. (Tr. 302.)

The Dictionary of Occupational Titles ("DOT") defines the job of "janitor" as follows:

> Keeps hotel, office building, apartment house, or similar building in clean and orderly condition and tends furnace, air-conditioner, and boiler to provide heat, cool air, and hot water for tenants, performing any combination of following duties: Sweeps, mops, scrubs, and vacuums hallways, stairs and office space. Regulates flow of fuel into automatic furnace or shovels coal into hand-fired furnace. Empties tenants' trash and garbage containers. Maintains building, performing minor and routine painting, plumbing, electrical wiring, and other related maintenance activities, using handtools. Replaces air-conditioner filters. Cautions tenants regarding complaints about excessive noise, disorderly conduct, or misuse of property. Notifies management concerning need for major repairs or additions to lighting, heating, and ventilating equipment. Cleans snow and debris from sidewalk. Mows lawn, trims shrubbery, and cultivates flowers, using handtools and power tools. Posts signs to advertise vacancies and shows empty apartments to prospective tenants. May reside on property and be designated Manager, Resident (any industry).

(Tr. 280) The Reasoning level for this job is set at 3, which means that the janitor must "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form[,]" and "[d]eal with problems involving several concrete variables in or from standardized situations." The Math level is 2 requiring that the janitor "[a]dd, substract, multiply, and divide all units of measure[,]  [p]erform the four operations with like common and decimal fractions[,] [c]ompute ratio, rate, and percent[,] [d]raw and interpret bar graphs[,] [and] [p]erform arithmetic operations involving all American monetary units." The Language level is also 3, requiring the following:

> Reading: Read a variety of novels, magazines, atlases, and encyclopedias. Read safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work.
>
> Writing: Write reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech.
>
> Speaking: Speak before an audience with poise, voice control, and confidence, using correct English and a well-modulated voice.

(Tr. 280-81.)

There is nothing in this record to suggest that plaintiff could have successfully performed the job of "janitor" for any length of time, much less ten years. Clearly, the jobs that plaintiff described as "janitor," which all appeared to be at restaurants, could not be properly classified as such. This record is clear that plaintiff simply does not possess the skills described above.[10] Therefore, there is not substantial evidence in this record to justify the ALJ's rejection of Dr. Cohen's evaluation of plaintiff.

The ALJ also inexplicably considered only a small portion of the July 22, 2003 opinion of the State agency's nonexamining psychologist, concluding that Dr. Bonnie Katz[11] found plaintiff to have "the mental residual functional capacity for routine, simple tasks in settings with low levels of contact with the general public and coworkers." (Tr. 18.) However, Dr. Katz also found plaintiff to be markedly limited in his ability to understand, remember, and carry out detailed instructions. (Tr. 235.) She further found him to be moderately limited in his ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with

---

[10] Even the VE who testified at the hearing agreed that an SVP 2 job would be "more approriate" than an SVP 3 job. She also indicated that "janitorial positions can expand into a little more duties that I would not call simple and repetitive. (Tr. 355-56.)

[11] The ALJ refers to Dr. Katz only as "the DDS psychological consultant." (Tr. 18.)

coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others. (Tr. 235-36.)

When the ALJ posed his hypothetical to the VE during the hearing, he did not include any of these limitations. (Tr. 353-54.) However, when plaintiff's counsel posed a hypothetical that did include these limitations and defined "moderate" as "at least 10% of the workday," the VE concluded that such a person would be "unemployable." (Tr. 374.)

The ALJ failed to explain why he chose not to consider the limitations identified by Dr. Katz. This violates SSR 96-6p, which, in part, sets forth the following "longstanding policies and policy interpretations":

1.   Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review.

2.   *Administrative law judges and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions.*

(emphasis added.) The ALJ barely even mentioned Dr. Katz's opinion, except to the extent it supported the ALJ's own conclusions, much less explained why he ignored her opinion.

In summary, although the Court finds that there was substantial evidence in the record for the ALJ's discrediting of the evaluations of Dr. Shields and Dr. Leach, there was not substantial evidence for his rejection of the opinions of Dr. Cohen and Dr. Katz. When the record, as it was before the ALJ, is considered as a whole, *Rogers v. Comm'r of Soc. Sec.*, 486

10

F.3d 234, 249 (6th Cir. 2007), it is possible, perhaps likely, that the determination at step four of the analysis would be that the plaintiff met one of the listed impairments (probably 12.05(C)[12]).[13]

## IV.

## CONCLUSION

For the reasons set forth above, the Court **REJECTS** the Report and Recommended Decision of Magistrate Judge Perelman to affirm the denial of benefits. Further the Court **REVERSES** the decision of the Commissioner and **REMANDS**[14] for further consideration and a new determination.

**IT IS SO ORDERED**.

Dated: September 18, 2009 _____

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[12] 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

[ * * *]

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1.

[13] In the alternative, given the age of the opinions of Drs. Cohen and Katz (they were almost three years old at the time), the ALJ probably should have ordered an updated consultative examination in this case. This was another one of the objections raised by the plaintiff and it is well-taken. Getting an updated exam may be appropriate on remand.

[14] Title 42, Section 405(g) provides, in relevant part: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

11